**TOWN OF OYSTER BAY, Plaintiff,**

v.

**OCCIDENTAL CHEMICAL CORPORATION, The Marmon Corporation, Columbia Corrugated Container Corporation, Great American Industries, Inc., a wholly-owned subsidiary of PLC Enterprises, Inc., G.A. Corrugated Corporation Great American Corrugated Container Corporation, Lin Pac, Inc., Lin Pac Containers International, Ltd., a wholly-owned subsidiary of Lin Pac Group, Ltd., Lin Pac Corrugated Containers Corporation, Lin Pac Containers Limited, Grumman Corporation, Grumman Aerospace Corporation, Jakobson Shipyard, Inc., Long Island Lighting Company, Konica Imaging U.S.A., Inc., Kollmorgen Corporation and Photocircuits Corporation, Defendants.**

No. 94–CV–0694 (FB).

United States District Court,
E.D. New York.

Dec. 5, 1997.

Robinson Silverman Pearce Aronsohn & Berman LLP by Peter R. Paden, Philip E. Karmel, New York, NY, for Plaintiff Town of Oyster Bay.

Whiteman, Osterman & Hanna by John Hanna, Albany, NY, for Defendant Occidental Chemical Corporation.

Lowenstein, Sandler, Kohl, Fisher & Boylan by Richard F. Ricci, Roseland, NJ, for Defendant The Marmon Corp.

Levene, Gouldin & Thompson by Michael R. Wright, Vestal, NY, for Great American

Industries, Inc., G.A. Corrugated Corp, Great American Corrugated Container Corp.

Paul, Hastings, Janofsky & Walker by Kevin C. Logue, New York, NY; Paul, Hastings, Janofsky & Walker by Charles A. Patrizia, for Defendants Lin Pac, Inc., Lin Pac Containers International, Ltd., Lin Pac Corrugated Containers Corp., Lin Pac Containers Ltd.

Hannoch Weisman, P.C. by Irvin M. Freilich, Roseland, NJ, for Defendants Grumman Corporation, Grumman Aerospace Corporation.

White & Case by Paul Milmed, New York, NY, for Defendant Jakobson Shipyard, Inc.

Arnold & Porter by Michael B. Gerrard, New York, NY, for Defendant Long Island Lighting Co.

David R. Case, Washington, D.C., for Defendant Konica Imaging, U.S.A., Inc.

Crowell & Moring, by Robert C. Davis, Jr., Washington, DC; Kensington & Ressler, P.C. by Henry Korn, New York, NY, for Defendants Kollmorgen Corporation, Photocircuits Corporation.

## TABLE OF CONTENTS

INTRODUCTION ...................................................188

BACKGROUND ...................................................188
 I. The Landfill .............................................188
 II. The Groundwater Contamination and the Town's Response ...189
 III. The Complaint ..........................................189
 IV. The Target Defendants ..................................190
 A. Occidental ........................................190
 B. Marmon ............................................190
 C. Grumman ...........................................191
 D. GACCC .............................................191
 V. The Pending Motions ....................................191
 A. The Town's Motion for Summary Judgment ............191
 B. The Great American Defendants' Motion for Summary Judgment .........192
 C. The Lin Pac Defendants' Motion for Summary Judgment ...............192
 D. Defendants' Motion for Partial Summary Judgment ...................192

DISCUSSION ....................................................193
 I. The Standard on a Motion for Summary Judgment ..........193
 II. The CERCLA Liability of the Target Defendants ..........193
 A. General Principles Regarding CERCLA Liability ......193
 B. The CERCLA Liability of Target Defendants Occidental, Marmon and
 Grumman ...........................................194
 1. Causation .....................................194
 2. The Interplay between New York State Regulatory Requirements and
 CERCLA ........................................195
 3. Conclusion ...................................197
 C. The CERCLA Liability of the Great American Defendants .............197
 1. Did Columbia Deposit Hazardous Substances at the Landfill? ..........198
 2. Are GACCC and G.A. Corrugated, as "dead and buried" corporations,
 subject to suit under CERCLA? .................198
 3. Can GAI be held liable for Columbia's Waste disposal practices
 under a veil-piercing analysis? ...............202
 4. Conclusion ...................................204
 III. The Successor Liability of the Lin Pac Defendants ......204
 IV. Joint and Several Liability v. Contribution ...........207
 V. The Town's State Law Claims ............................209
 A. Statute of Limitations ............................209
 B. The Liability of GACCC and G.A. Corrugated under State Law ..........210
 C. The Liability of the Lin Pac Defendants under State Law ............211

CONCLUSION ...................................................211

BLOCK, District Judge.

## INTRODUCTION

In this action, which arises under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, 42 U.S.C. § 9601 *et seq.* ("CERCLA" or "the Act"), and New York common law, plaintiff Town of Oyster Bay ("Town") seeks recovery of costs for its response to the alleged release or threatened release of hazardous substances at a landfill formerly operated by the Town in Syosset, New York. The defendants are corporations that are alleged either to have brought hazardous materials to the landfill or to have succeeded to the liabilities of such corporations.

There are four motions currently before the Court: (1) a motion by the Town for partial summary judgment on the issue of CERCLA liability against defendants Occidental Chemical Corporation ("Occidental"), The Marmon Corporation ("Marmon"), Great American Corrugated Container Corporation ("GACCC"), Grumman Corporation and Grumman Aerospace Corporation (collectively "Grumman") pursuant to Rule 56 of the Federal Rules of Civil Procedure[1]; (2) a motion for summary judgment by defendants GACCC, G.A. Corrugated Corporation ("G.A. Corrugated") and Great American Industries, Inc. ("GAI") seeking dismissal of the complaint as against them;[2] (3) a motion by defendants Lin Pac, Inc., Lin Pac Containers International, Ltd., Lin Pac Corrugated Containers Corporation ("LPCCC"), and Lin Pac Containers Limited (collectively the "Lin Pac defendants") for summary judgment dismissing the complaint as against them; and (4) a motion by Occidental, Marmon, the Great American defendants, the Lin Pac defendants, Grumman, Jakobson Shipyard, Inc. ("Jakobson"), Long Island Lighting Company ("LILCO"), Konica Imaging, U.S.A., Inc. ("Konica"), Kollmorgen Corporation ("Koll-

morgen"), and Photocircuits Corporation ("Photocircuits") for partial summary judgment dismissing the Town's CERCLA claims to the extent that they seek joint and several liability against the defendants, and dismissing the Town's State common law nuisance and unjust enrichment claims on statute of limitations grounds.

## BACKGROUND

The Court's discussion of the facts giving rise to this action is drawn from the complaint, the numerous statements prepared by the parties pursuant to former Local Rule 3(g), now Local Rule 56.1, and the extensive record in this case. Unless otherwise noted, the facts are undisputed.

### I. The Landfill

The approximately 35-acre former landfill is owned by the Town and is located just north of the Long Island Expressway in Syosset, within 1.25 miles of more than one thousand residences and less than 150 feet from a local elementary school. From 1936 until approximately 1975, the landfill, which was unlined, accepted residential and commercial waste, including cesspool waste, as well as demolition, agricultural and industrial waste. The complaint alleges, *inter alia,* that: (1) Occidental's predecessors-in-interest, Rubber Corporation of America ("RUCO"), Hooker Chemical Corporation and Hooker Chemicals and Plastics Corporation (collectively "Hooker") disposed of thousands of tons of hazardous wastes containing heavy metals, solvents, organics, oils and sludges, plasticizers and PCBs each year between 1946 through 1968; (2) Marmon's predecessor-in-interest, Cerro Wire & Cable Corp. ("Cerro"), disposed of thousands of tons of industrial sludge containing iron, chromium, zinc, copper, lead, cadmium, and nickel each year for a period of 25 years; (3) Columbia Corrugated Container Company ("Columbia"), the alleged predecessor-in-in-

---

1. The four defendants that are the object of the Town's summary judgment motion will be referred to as the "target defendants."

2. G.A. Corrugated, which was purportedly dissolved in 1981, was a wholly-owned subsidiary of GAI. GACCC, which was purportedly dissolved

in 1982, was a wholly-owned subsidiary of G.A. Corrugated. The Court will discuss the structure of these three corporations in greater detail *infra.* Whenever practicable, the Court will refer to GAI, G.A. Corrugated, and GACCC collectively as the "Great American defendants."

terest of the Great American defendants and the Lin Pac defendants, disposed of more than 100,000 gallons of dyes, inks, and sludges containing iron, zinc, copper, lead, cadmium, nickel, chromium, titanium, manganese, magnesium and phenols for a period of many years ending in 1975; and (4) Grumman disposed of industrial sludge containing hydroxides of chromium, aluminum, iron, paint, ammunition, machine shop waste, and wastes from manufacturing processes.

## II. The Groundwater Contamination and the Town's Response

On January 28, 1975, the Nassau County Department of Health ("NCDOH") closed the landfill based on concerns that it was polluting the groundwater. In 1983, an environmental report was prepared on behalf of NCDOH that indicated that the groundwater underneath and surrounding the landfill contained concentrations of arsenic, cadmium, chromium and lead at levels in excess of New York State drinking water standards. Also in 1983, the United States Environmental Protection Agency ("EPA") placed the landfill on the Superfund National Priorities List, which sets forth those sites that pose the highest degree of risk to human health and the environment. The landfill has also been placed on New York's Registry of Inactive Hazardous Waste Disposal Sites, and the New York State Department of Environmental Conservation has determined that the landfill is a significant threat to the public health and environment, and that remedial action is required.

In 1986, the EPA and the Town entered into an Administrative Order on Consent that obligated the Town to prepare a Remedial Investigation and Feasibility Study ("RI/FS") of the landfill. Because of the complexity of the environmental problems at the landfill, the EPA divided the evaluation and cleanup of the landfill into two phases, or "operable units" (hereinafter "OU1 and OU–2"). The RI/FS for OU–1 investigated the nature and extent of contamination at the landfill property and focused upon control of

contamination at its source, while the RI/FS for OU–2 addressed the migration of contaminants from the landfill into the groundwater. In 1990, based on the results of the RI/FS report for OU–1, as well as an evaluation of comments submitted during the public comment period, the EPA determined that the Town should implement New York State closure requirements specified in the Official Compilation of Codes, Rules & Regulations of the State of New York at title 6, part 360. Specifically, the EPA directed that a geosynthetic membrane cap be constructed on the top surface of the landfill. The EPA estimated the cost of this remedy as $26 million. The EPA requested that Occidental, Grumman, Jakobson, Marmon, the Lin Pac defendants, Kollmorgen and LILCO, *inter alia,* voluntarily join the Town in performing or financing the remedial action selected by EPA; however, each declined.[3]

## III. The Complaint

This action, filed on February 18, 1994, seeks to recover the response costs that the Town has incurred in connection with the landfill remediation, estimated at approximately $10 million, and to obtain a declaratory judgment that defendants are liable for future response costs. The complaint contains six claims for relief: (1) a claim for joint and several liability for past and future response costs pursuant to 42 U.S.C. § 9607(a)(4)(A); (2) a claim for joint and several liability for past and future response costs pursuant to 42 U.S.C. § 9607(a)(4)(B); (3) a claim for contribution to the Town for past and future response costs pursuant to 42 U.S.C. § 9613(f)(1); (4) a State common law claim for creation and maintenance of a public nuisance; (5) a State common law claim for unjust enrichment based upon defendants' failure to abate the public nuisance; and (6) a State common law claim for contribution.

On February 13, 1995, Magistrate Judge Arlene R. Lindsay signed a Case Management Order that divided the action into two

---

**3.** In respect to OU–2, an EPA Record of Decision dated March 28, 1996 concluded that groundwater contamination was limited and did not pose a significant risk to human health or the environment. Accordingly, the EPA determined that no

further remedial action would be required. The EPA specifically observed that the principal threats at the landfill were being addressed through the installation of the landfill cap as part of the OU–1 remediation.

separate phases. During the first phase, the following issues are to be litigated: (1) whether each current defendant is liable under 42 U.S.C. § 9607(a)(3) or § 9607(a)(4); (2) whether the Town is liable pursuant to § 9607; (3) whether the Town's response costs are recoverable pursuant to § 9607(a)(4); (4) the extent to which the Town's response costs should be apportioned between the Town and all liable persons; and (5) claims among and between defendants regarding indemnification or successor and predecessor liability. The issues to be resolved during the second phase include the apportionment of response costs among defendants and third-party defendants on a percentage basis and the amount of plaintiff's response costs, including whether costs were necessary and incurred in a manner consistent with the National Contingency Plan.[4] Discovery, though largely complete, is still ongoing.

### IV. The Target Defendants

In respect to the Town's motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure against the target defendants on the issue of their CERCLA liability, the Court summarizes the role that each of these defendants allegedly played in the disposal of hazardous waste at the landfill.

#### A. *Occidental*

Occidental is the successor-in-interest to RUCO, which operated a plant in Hicksville, New York from 1945 through 1965. In 1965, Hooker Chemical Corporation purchased RUCO and operated the Hicksville plant as its RUCO Division. Hooker Chemical Corporation changed its name to Hooker Chemi-

cal & Plastics Corporation in 1974 and to Occidental in 1982. The RUCO Division together with the Hicksville plant were sold to employees in 1982.

In its answer to the complaint, Occidental admitted that it "disposed of or arranged for disposal of hazardous substances or waste containing hazardous substances at the Landfill." Answer, Affirmative Defenses and Counterclaims of Defendant Occidental Chemical Corporation at ¶ 48. More specifically, Occidental has admitted that RUCO sent waste from the Hicksville plant to the landfill from 1946 through 1965 and that Hooker sent waste to the landfill from 1965 through 1968. Further, although Occidental contends that RUCO and Hooker did not send all of the hazardous substances alleged in the complaint to the landfill, Occidental does admit in the Defendants' collective response to the Town's Rule 3(g) Statement ("Collective Response") that Hooker deposited one ton of Aroclor 1248, a type of PCB, at the landfill between 1965 and 1967 and that, as a general matter, waste material from the RUCO plant contained N-butyl alcohol.

#### B. *Marmon*

Marmon is the successor-in-interest to Cerro, which manufactured steel electrical conduit, hot rolled copper rod, and steel strip at a plant on Robbins Lane in Syosset from 1952 through 1986. In the Collective Response, Marmon admits to having disposed of approximately 20,000 tons of metal hydroxide sludge at the landfill between 1952 and 1974. Further, Marmon also admits that the metal hydroxide sludge contained trace levels of copper, zinc, lead, cadmium, chromium, nickel, cyanides, arsenic, mercury, selenium, sil-

---

4. Pursuant to 42 U.S.C. § 9605, the National Contingency Plan must contain "procedures and standards for responding to releases of hazardous substances, pollutants, and contaminants." These include criteria for prioritizing among releases and threatened releases across the United States based upon the "relative risk or danger to public health or welfare or the environment ... taking into account to the extent possible the population at risk, the hazard potential of the hazardous substances at such facilities, the potential for contamination of drinking water supplies, the potential for direct human contact, the potential for destruction of sensitive ecosystems,

the damage to natural resources which may affect the human food chain and which is associated with any release or threatened release, the contamination or potential contamination of the ambient air which is associated with the release or threatened release, State preparedness to assume State costs and responsibilities, and other appropriate factors." 42 U.S.C. § 9605(a)(8)(A). The statute also requires that the president assemble and revise a list of national priorities among the known releases and threatened releases in the United States (hereinafter "National Priorities List").

ver, chloroform, hydrazine, manganese and phenol.

### C. Grumman

Grumman operated a complex of manufacturing buildings on approximately 500 acres in Bethpage, New York. In its complaint, the Town alleges that Grumman disposed of thousands of tons of industrial sludge at the landfill. Grumman has denied these allegations both in its answer to the complaint and in the Collective Response. However, included in the record before the Court is Grumman's answer to a 1986 EPA questionnaire in which it indicated that between 1949 and 1966, it deposited sludge from its Industrial Waste Treatment Plant at the landfill and that the sludge contained hydroxides of chromium, aluminum and iron. The record also contains excerpts from the testimony of John H. Ohlmann, a Grumman consultant, who indicated that the sludges sent to the landfill between 1952 and 1965 contained chromium. Finally, in Grumman's response to the Town's interrogatories, it stated that the sludge may also have contained, *inter alia*, toluene, zylene, methyl ethyl ketone, trichloroethylene, chloroform, vinyl chloride and dichloroethylene.

### D. GACCC

GACCC is allegedly the successor-in-interest of Columbia, which manufactured corrugated containers at a plant adjacent to the landfill. The Town alleges that Columbia disposed of more than 100,000 gallons of industrial sludge at the landfill each year before the landfill was closed in 1975. On July 15, 1976, defendant G.A. Corrugated, a Delaware corporation and wholly-owned subsidiary of GAI purchased all of the issued and outstanding shares of Columbia, which was thereafter operated as a wholly-owned subsidiary of G.A. Corrugated. In 1978, G.A. Corrugated purchased the outstanding capital stock of Midland Corporation, and later that year, Columbia was merged into Midland, which then changed its name to GACCC. GACCC was a wholly-owned subsidiary of G.A. Corrugated. In 1980, defendant LPCCC purchased substantially all of the assets of GACCC. G.A. Corrugated was

dissolved pursuant to Delaware law on December 21, 1981, and GACCC was dissolved pursuant to New York law on February 26, 1982. The Town does not allege that any of the Great American defendants disposed of waste at the landfill; rather, their liability, if any, is premised upon the activities of Columbia. Although the Great American defendants admit that Columbia disposed of sludge at the landfill, they dispute whether that sludge was in fact hazardous.

### V. The Pending Motions

The four pending motions present a number of overlapping issues regarding the scope and nature of CERCLA liability. Specifically, the Court is called upon to determine whether the Town, as a responsible person itself, may seek joint and several liability against the defendants or whether it is limited to contribution from those defendants ultimately found liable under CERCLA. Additionally, the Court, applying still emerging principles of successor liability, must determine the extent to which the Great American defendants and the Lin Pac defendants must shoulder the responsibility for Columbia's waste disposal practices.

### A. The Town's Motion for Summary Judgment

In support of its motion for summary judgment against the target defendants, the Town argues that: (1) these defendants are liable under the four-part test set forth at 42 U.S.C. § 9607(a); (2) the liability of these defendants is joint and several; and (3) their affirmative defenses are insufficient as a matter of law. The target defendants have filed a joint response in which they argue: (1) the Town is not entitled to hold the target defendants jointly and severally liable under CERCLA; rather, the Town's CERCLA claim, if any, is limited to contribution; (2) the affirmative defenses asserted by the target defendants are relevant to the Court's allocation of response costs between the Town and the other defendants; and (3) the Town should not be able to recover from the target defendants if the Town's remediation costs were in fact attributable to landfill cleanup or closing requirements imposed by State law.

Each of the target defendants has also filed an individual response to the Town's motion. In its response, Occidental argues that: (1) the motion is premature because expert discovery is not complete; and (2) the motion should be denied because there are genuine issues of material fact regarding whether Occidental disposed of hazardous substances at the landfill and whether the Town's response costs have been incurred to deal with harm that resulted from Occidental's disposal of wastes at the landfill. Marmon and Grumman submit further papers on the issue of joint and several liability; additionally, Grumman argues that the response costs incurred by the Town are not attributable to Grumman because the materials it disposed of at the landfill did not pose any danger to human health. GACCC contends that material issues of fact exist regarding the nature of the waste that Columbia sent to the landfill, which preclude an award of summary judgment [5]

### B. The Great American Defendants' Motion for Summary Judgment

In support of their motion for summary judgment, the Great American defendants argue that: (1) GACCC, by virtue of its dissolution and its alleged lack of corporate assets, is not a proper CERCLA defendant; and (2) GAI and G.A. Corrugated are not liable under principles of "operator" liability for Columbia's disposal of waste at the landfill. The Town contends that: (1) GACCC has the capacity to be sued regardless of its dissolution and is therefore a proper party in this action; and (2) GAI is derivatively liable for the CERCLA liabilities of GACCC based on a traditional veil-piercing analysis. Defendants Occidental, Marmon, Grumman, Jakobson, LILCO, Konica, Kollmorgen and Photocircuits also submit a brief in opposition to the motion of the Great American defendants in which they argue: (1) under New York and Delaware law, which they contend apply in this case, GACCC and G.A. Corrugated remain potentially liable under CERCLA; (2) genuine issues of material fact preclude a finding that GACCC and G.A. Corrugated have completely dissolved and

are not proper CERCLA defendants; and (3) CERCLA's broad remedial purpose would be undermined if the Great American defendants were able to avoid liability.

### C. The Lin Pac Defendants' Motion for Summary Judgment

In support of their motion for summary judgment, the Lin Pac defendants argue: (I) they are not liable for Columbia's disposal of waste at the landfill under principles of successor liability because LPCCC purchased the assets of GACCC in an arm's length transaction and did not substantially continue GACCC's business; (2) LPCCC did not expressly or impliedly agree to assume any of GACCC's liabilities under CERCLA; and (3) New York law similarly mandates dismissal of the state common law claims against the Lin Pac defendants. In opposition, the Town contends: (1) CERCLA liability is broad and expansive and should be found to hold the Lin Pac defendants responsible for the waste disposal practices of Columbia under the facts present here; (2) LPCCC substantially continued the business of GACCC and should be determined to be GACCC's successor-in-interest for purposes of CERCLA liability; and (3) the corporate transaction between LPCCC and GACCC was a *defacto* merger and the Lin Pac defendants are therefore liable under general principles of successor liability. These identical arguments are also contained in a Memorandum submitted by defendants Occidental, Marmon, LILCO, Grumman, Jakobson, Konica, Kollmorgen, and Photocircuits in opposition to the Lin Pac defendants' motion for summary judgment.

### D. Defendants' Motion for Partial Summary Judgment

All of the defendants move for partial summary judgment seeking dismissal of the Town's claims for relief to the extent that the Town seeks to impose joint and several liability against them. They also seek dismissal of the Town's fourth and fifth claims, which arise under New York common law, as

---

5. GACCC's Memorandum of Law is also offered in support of the Great American defendants'

motion for summary judgment and will be discussed in greater detail *infra*.

barred by the three-year statute of limitations applicable to actions to recover damages for an injury to property. The Town again responds that joint and several liability is appropriate, and further argues that its common law claims are not time-barred.

## DISCUSSION

### I. Standard on a Motion for Summary Judgment

As each of the four motions pending before the Court seeks summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure, the Court reviews, as a preliminary matter, the standard applicable to resolving summary judgment motions. The Court of Appeals for the Second Circuit has held that in CERCLA cases, summary judgment "is a 'powerful legal tool[ ]' · that can 'avoid lengthy and perhaps needless litigation.'" *B.F. Goodrich Co. v. Betkoski,* 99 F.3d 505, 514 (2d Cir.1996), *reh' denied,* 112 F.3d 88 (1997) (quoting *United States v. Alcan Aluminum Corp.,* 990 F.2d 711, 720 (2d Cir.1993) (*Alcan II* )). However, the Second Circuit has also stressed that the utility of the summary judgment motion in CERCLA cases "is not a license to use it when material facts are genuinely disputed." *Betkoski,* 99 F.3d at 521.

The standard for granting summary judgment in CERCLA cases is no different from other cases. *Id.* A motion for summary judgment may not be granted unless the court determines that there is no genuine issue of material fact to be tried and that the moving party is entitled to judgment as · a matter of law. Fed.R.Civ.P. 56(c); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322–323, 106 S.Ct. 2548, 2552–2553, 91 L.Ed.2d 265 (1986). The burden is upon the moving party to identify those portions of the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits that it believes demonstrate the absence of a genuine issue of material fact. *See Celotex Corp., supra,* at 323, 106 S.Ct. at 2552. All ambiguities must be resolved, and all inferences drawn, in favor of the nonmoving party. *See*

*Whalen v. County of Fulton,* 126 F.3d 400, 401 (2d Cir.1997). Once the moving party has carried its burden, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts.... [T]he non-moving party must come forward with 'specific facts showing that there is a *genuine issue for trial.'*" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–587, 106 S.Ct. 1348, 1355–1356, 89 L.Ed.2d 538 (1986) (quoting Fed.R.Civ.P. 56(e)) (other citations omitted) (emphasis in original). The judge's role in reviewing a motion for summary judgment is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *see also Beatie v. City of New York,* 123 F.3d 707, 710–711 (2d Cir.1997).

### II. The CERCLA Liability of the Target Defendants

#### A. General Principles Regarding CERCLA Liability

■ CERCLA is "a broad remedial statute that was designed to enhance the authority of the EPA to respond effectively and promptly to toxic pollutant spills that threaten[ ] the environment and human health." *B.F. Goodrich Co. v. Murtha,* 958 F.2d 1192, 1197 (2d Cir.1992). As a remedial statute, CERCLA should be construed broadly in order to give effect to its purposes. *See Betkoski,* 99 F.3d at 514. These purposes include "facilitating efficient responses to environmental harm, holding responsible parties liable for the costs of the cleanup, and encouraging settlements that reduce the inefficient expenditure of public funds on lengthy litigation." *Id.*

CERCLA is a strict liability statute that imposes liability upon four categories of parties: (1) owners and operators of facilities [6]; (2) any person who owned or operated a facility at the time hazardous materials were disposed at the facility; (3) any person who by contract, agreement or otherwise, ar-

---

6. The term "facility" is defined in part as "any site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located." 42 U.S.C. § 9601(9).

ranged for disposal, treatment, or transport of hazardous substances owned or possessed by that person; and (4) any person who accepts or accepted any hazardous substances for transport to disposal or treatment facilities from which there is a release or threatened release of hazardous substances that causes the incurrence of response costs. 42 U.S.C. § 9607(a); *see also Murtha,* 958 F.2d at 1198; *State of New York v. Shore Realty Corp.,* 759 F.2d 1032, 1043 (2d Cir. 1985). Responsible parties are liable for response costs incurred by any other responsible party, the United States Government, a State, or an Indian tribe. 42 U.S.C. § 9607(a).

■ A plaintiff establishes a *prima facie* case under CERCLA by proving that: (1) the defendant is within one of the four categories of responsible parties; (2) the landfill site qualifies as a "facility" as defined in 42 U.S.C. § 9601(9); (3) there is a release[7] or threatened release of hazardous substances at the facility; (4) the plaintiff has incurred response costs as the result of the release or threatened release; and (5) the costs and response actions conform to the National Contingency Plan. *See Betkoski,* 99 F.3d at 514; *see also ABB Indus. Sys., Inc. v. Prime Technology, Inc.* 120 F.3d 351, 356 (2d Cir. 1997); *State of New York v. Lashins Arcade Co.,* 91 F.3d 353, 359 (2d Cir.1996). Once the plaintiff has made a *prima facie* showing of liability, a defendant can only avoid responsibility by establishing that the release or threatened release of hazardous materials was caused by an act of God, an act of war, certain acts or omissions of third parties other than those with whom the defendant has a contractual relationship, or any combination of these factors. 42 U.S.C. § 9607(b).

Finally, CERCLA expressly provides that it does not preempt any State "from imposing any additional liability or requirements with respect to the release of hazardous substances within such State," 42 U.S.C. § 9614(a); similarly, it does not "affect or modify in any way the obligations or liabili-

ties of any person under other Federal or State law, including common law, with respect to releases of hazardous substances or other pollutants or contaminants." 42 U.S.C. § 9652(d); *see Shore Realty Corp.,* 759 F.2d at 1041.

### B. The CERCLA Liability of Target Defendants Occidental, Marmon and Grumman

The Town argues that the four target defendants are liable as a matter of law for response costs under the test set forth above. Although the Great American defendants have joined with the other target defendants in responding to the Town's motion, as previously indicated they have also filed a separate motion for summary judgment largely premised upon matters unique to their corporate structure, which will discussed in greater detail below. As to the remaining three target defendants, there is no real dispute that each is a potentially responsible person under § 9607(a), and that the landfill qualifies as a facility for purposes of 42 U.S.C. § 9601(9). Therefore, the first and second prongs of the test are satisfied in this case. However, whether the Town has satisfied the final three prongs of the test is a matter of sharp dispute. These three defendants argue that the Town has failed to show that waste deposited by these defendants caused the release or threatened release of hazardous materials at the landfill. Moreover, all four target defendants argue that the remediation ordered by the EPA for OU–1 is independently required by New York State solid waste regulations and that the defendants should not be responsible for shouldering these costs under CERCLA. The Court will evaluate both of these arguments in turn.

#### 1. Causation

Occidental, Marmon and Grumman argue that there is no evidence that the industrial waste they deposited at the landfill, although comprised of hazardous substances, actually caused a "release or threatened release" of

---

7. 42 U.S.C. § 9601(22) defines "release" as "any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing into the environment

(including the abandonment or discarding of barrels, containers, and other closed receptacles containing any hazardous substance or pollutant or contaminant)."

hazardous substances. Occidental argues that the PCBs it deposited have not been detected in the soil, groundwater, or air emissions from the landfill, and that the N-butyl alcohol it admits to having deposited will normally biodegrade to water and carbon dioxide in a terrestrial environment. Similarly, Marmon argues that its metal hydroxide sludge did not cause the release of heavy metals at the landfill because of the extremely low concentration of metals observed in the leachate from Marmon's sludge. Finally, Grumman argues that its industrial waste contained only trace levels of certain metals and that its waste was therefore not harmful to the environment.

■ However, the Second Circuit recently reaffirmed that causation is not required to establish liability under CERCLA. *Betkoski,* 99 F.3d at 517; *see also Alcan II,* 990 F.2d at 721; *United States v. Alcan Aluminum Corp.,* 964 F.2d 252, 264–267 (3rd Cir. 1992) (*Alcan I* ); *Shore Realty Corp.,* 759 F.2d at 1044. In *Alcan I,* the Second Circuit recognized "the difficulty CERCLA plaintiffs would face in the multi-generator context if required to trace the cause of the response costs to each responsible party." *Alcan I,* 964 F.2d at 264. The Court therefore rejected the precise argument made by Occidental, Marmon and Grumman here—that a CERCLA plaintiff must demonstrate that a particular defendant's disposal of waste caused a release of hazardous waste or caused the plaintiff to incur response costs—and instead held that a plaintiff "must simply prove that the defendant's hazardous substances were deposited at the site from which there was a release and that the *release* caused the incurrence of response costs." *Id.* at 266 (emphasis in original); *see also Betkoski,* 99 F.3d at 517 ("[I]f we required a plaintiff to show more than a release or threatened release, we essentially would be asking the plaintiffs to prove that a specific defendant's hazardous substances caused the release of a hazardous substance. No causation is needed, however, to establish liability under CERCLA.").

In *Betkoski,* the Second Circuit rejected a second argument made by these defendants: that they cannot be held liable under CERC-LA if their waste contained only a trace amount of hazardous substances. Rather, the Court, citing *Murtha and Alcan II,* held that "[t]he absence of threshold quantity requirements in CERCLA leads logically to the conclusion that the Act's 'hazardous substance' definition includes even minimal amounts." *Betkoski,* 99 F.3d at 505.

Accordingly, to the extent that Occidental, Marmon and Grumman argue that they are not responsible parties because the Town has failed to demonstrate that wastes deposited by these defendants caused the release of hazardous substances at the landfill and because their waste contained only trace amounts of contaminants, the Second Circuit has expressly determined that such considerations have no bearing upon whether these parties are liable under CERCLA. While they may be properly considered in the second phase of this case when allocating these defendants' responsibility, they do not serve as a defense to a finding of liability in the first instance. Therefore, the Court concludes that by introducing competent proof that each of these three defendants disposed of waste containing hazardous substances, the Town has satisfied its burden of demonstrating a release or threatened release of hazardous substances at the landfill.

### 2. The Interplay between New York State Regulatory Requirements and CERC-LA

All four target defendants also contend that the costs that were concededly incurred by the Town in studying the landfill and in preparing to remediate the site are not CERCLA response costs because the remediation ordered by the EPA is essentially equivalent to that required by part 360 of New York State's Solid Waste Regulations. N.Y. Comp.Codes R. & Regs., tit. 6, part 360. They maintain therefore that they should not be required to bear the cost of remedial action that would have been required under New York State law even in the absence of EPA intervention. As part of this argument, the target defendants contend that the Town itself is largely responsible for the condition of the landfill and that it is the Town's failure to comply with regulatory requirements, and

not the waste disposal practices of the target defendants, that caused the Town to incur response costs.

A number of district courts have recently considered the interplay between CERCLA and state regulatory regimes and whether responsible parties under CERCLA should be required to bear response costs to the extent that CERCLA remediation overlaps with state regulation. In *Barnes Landfill, Inc. v. Town of Highland,* 802 F.Supp. 1087 (S.D.N.Y.1992), the district court held that the $2 million that the plaintiff in that case had spent to abate the release of hazardous substances would not be recoverable, concluding: "[o]rdinary closing or clean-up costs not pertaining to hazardous substances, incurred under state law or otherwise, would not be a basis for holding defendants responsible under CERCLA." *Id.* at 1088; *see also City of Seattle v. Amalgamated Servs., Inc.,* 1994 WL 869839 at *2 (W.D.Wash. Mar.4, 1994) ("Any actions the City was already obligated to take to meet the [state and local minimum functional standards] were not caused by the escape of hazardous substances. Only costs incurred to meet additional requirements caused by the escape of hazardous substances, or listing as a Superfund site, qualify as necessary response costs.")

By contrast, in *Town of New Windsor v. Tesa Tuck Inc.,* 919 F.Supp. 662 (S.D.N.Y. 1996), the district court, expressly rejecting the reasoning of *Barnes Landfill* and *City of Seattle,* held that "it would be illogical to conclude that as a matter of law a plaintiff could not recover costs associated with an appropriate remedy that included actions required by otherwise applicable state statutes and regulations." *Town of New Windsor,* 919 F.Supp., at 671. Terming Barnes Landfill and *City of Seattle* "anomalous," the Court observed that "the impetus behind a plaintiff's decision to begin the cleanup process is irrelevant to a determination of liability." *Id.* at 670; *see also Town of Wallkill v. Tesa Tape, Inc.,* 891 F.Supp. 955, 960–962 (S.D.N.Y.1995); *City of Fresno v. NL Industries, Inc.,* 1995 WL 570375 at *2 (E.D.Cal. Jan. 19, 1995); *State of Arizona v. Motorola, Inc.,* 805 F.Supp. 742 (D.Ariz.1992).

■ The Court finds *Town of New Windsor* and the cases cited therein persuasive and elects to follow them. The mere fact that the remediation ordered by the EPA overlaps with New York regulatory requirements should not absolve the four target defendants from liability under CERCLA. As noted above, CERCLA is a strict liability statute that imposes liability regardless of relative degrees of fault or responsibility. The affirmative defenses contained in the statute are exclusive. *See Murtha,* 958 F.2d at 1198. One of the purposes of the statute is to ensure that parties responsible for the release of hazardous substances, and not the taxpayers, bear the cost of the cleanup. To permit these defendants to evade responsibility for the cleanup because of the fortuitous congruence of the EPA-mandated remediation and New York State regulation would completely subvert this purpose and would render CERCLA's strict liability regime a nullity.

Moreover, as the district court noted in *State of Arizona v. Motorola:*

It would be contrary to CERCLA's intentions to provide that a responsible defendant cannot be held liable where an appropriate remedy contained any provisions identical to landfill closure aspects, or floodplain requirements. If that were the situation, then responsible defendants would construct a laundry list of measures which, because they were identical to other sound engineering and landfill management principles, would allow defendants to be absolved from costs, even though those activities may be needed to accomplish proper cleanup and containment according to a[ ] [Remedial Action Plan].

*Id.* at 748. A decision absolving defendants from liability as a matter of law would, as the district court noted in *State of Arizona,* encourage potentially responsible persons to scour state and local statutes and regulations in an effort to find an overlapping provision that would in essence provide an escape hatch from CERCLA liability. This would discourage such parties from entering into settlements and would result in an even greater expenditure of public funds on lengthy CERCLA litigation, subverting yet

another of CERCLA's remedial purposes. *See Betkoski,* 99 F.3d at 514.

■ The Court rejects the four target defendants' argument that the Town's alleged participation in the release of hazardous substances at the landfill and its failure to take prompt remedial measures warrants the legal conclusion that these defendants are not liable under CERCLA. That the Town may itself have contributed substantially to the condition of the landfill will no doubt be relevant with regard to the allocation of responsibility for response costs. However, based upon the clear statutory language and the exclusivity of the affirmative defenses contained in § 9607, the Court concludes that the Town's alleged culpability does not absolve the target defendants from liability.

■ Finally, for purposes of the instant motion, the Court concludes that at least some of the costs incurred by the Town are consistent with the National Contingency Plan. The landfill was included on the National Priorities List in 1983 and is also included on New York's Registry of Inactive Hazardous Waste Disposal Sites. The costs incurred by the Town in preparing the RI/FS for OU–1 and OU–2 were pursuant to a consent order with the EPA, and the construction of a geosynthetic cap on the landfill was mandated by an EPA Record of Decision. On these facts, it is readily apparent to the Court that at least some of the costs incurred by the Town were consistent with the National Contingency Plan. Pursuant to the Case Management Order, the issue of precisely which costs were necessary and incurred in a manner consistent with the National Contingency Plan will be litigated in the second phase of this case.

### 3. Conclusion

■ In sum, the Court concludes as a matter of law that: (1) Occidental, Marmon, and Grumman are within one of the four categories of responsible parties set forth in 42 U.S.C. § 9607(a); (2) the landfill is a facility as defined in 42 U.S.C. § 9601(9); (3) there has been a release or threatened release of hazardous substances at the landfill; (4) the Town incurred costs responding to this release or threatened release; and (5)

the costs and response actions are consistent with the National Contingency Plan. Occidental's argument that additional expert discovery is required and that the Town's summary judgment motion is consequently premature is without merit, as the causation arguments offered by Occidental and the other target defendants in opposition to the Town's motion are insufficient as a matter of law. To the extent that the target defendants' answers to the complaint contain affirmative defenses others than those set forth at 42 U.S.C. § 9607(b), those affirmative defenses do not serve as defenses to liability, but the Court may consider them in respect to the apportionment of responsibility for response costs. *See Thaler v. PRB Metal Prods.,* 815 F.Supp. 99, 102 (E.D.N.Y.1993), *aff'd.,* 28 F.3d 102 (2d Cir.1994). Accordingly, the Court concludes as a matter of law that Occidental, Marmon and Grumman are liable under CERCLA. The Town's motion for summary judgment is therefore granted to the extent that it seeks summary judgment on the issue of CERCLA liability against these three target defendants.

### C. The CERCLA Liability of the Great American Defendants

As set forth above, the liability of the Great American defendants, if any, derives from the waste disposal practices of Columbia before its acquisition by G.A. Corrugated. Apart from the arguments raised in the joint brief filed by the target defendants, the Great American defendants have filed a summary judgment motion of their own in which they argue that they are immune from suit under CERCLA for a number of reasons unique to their corporate structure and history. Generally, these arguments break down into three categories. First, the Great American defendants argue that the Town has failed to demonstrate by competent proof that Columbia's industrial waste contained hazardous substances. Second, they argue that the Town cannot hold GACCC or G.A. Corrugated liable because they have been dissolved and no longer possess assets. Third, they argue that GAI cannot be held liable under a traditional veil-piercing analy-

sis. The Court will examine each of these three contentions in turn.

### 1. Did Columbia Deposit Hazardous Substances at the Landfill?

■ GACCC argues that there is inadequate evidence in the record to support the Town's claim that Columbia deposited hundreds of thousands of gallons of hazardous sludge at the landfill. GACCC admits for purposes of these motions that Columbia did in fact transport its waste material to the landfill for a period of years. However, it disputes whether that waste material in fact contained hazardous substances that would subject GACCC to CERCLA liability. But in response to a Request for Admission served by the Town, the Great American defendants "admit[ted], on information and belief, that Waste Material that contained a hazardous substance and that was owned or possessed by [Columbia], which was the owner of a Plant that GACCC later owned, was disposed of or treated at the Landfill...." Rule 36(b) of the Federal Rules of Civil Procedure provides that "[a]ny matter admitted under this rule is conclusively established unless the court on motion permits withdrawal or amendment of the admission." GACCC has not sought such relief here. Accordingly, regardless of GACCC's current effort to qualify its response to the Notice to Admit as somehow less than binding, the Court gives weight to GACCC's prior admission, despite the fact that it was made on information and belief. See Lipton Indus., Inc. v. Ralston Purina Co., 670 F.2d 1024, 1030 (C.C.P.A. 1982) (holding that admission contained in an answer was binding, despite the fact that it was made "on information and belief").

Further, the EPA Record of Decision for OU–I and NCDOH documents contained in the record detail Columbia's disposal of industrial sludge at the landfill. A January 20, 1975 NCDOH Memorandum shows that a sample of Columbia's sludge contained, inter alia, iron, copper, zinc, lead, cadmium, chromium, and nickel. The sludge was described in another NCDOH document as a "white-blue liquid with [the] consistency of heavy latex paint." However, GACCC contends that the EPA and NCDOH documentation is hearsay and does not serve as competent proof to support a finding of CERCLA liability.

■ Both the EPA Record of Decision and the NCDOH documents annexed to the Town's supporting papers are offered to prove the truth of the matter asserted therein, i.e., that Columbia's sludge contained hazardous materials, and are therefore plainly hearsay. Fed.R.Evid. 801(c). However, as the Town points out, these reports would likely be admissible as exceptions to the hearsay rule because they constitute "factual findings resulting from an investigation made pursuant to authority granted by law." Fed. R.Evid. 803(8)(C). Further, although Rule 56(e) of the Federal Rules of Civil Procedure requires that affidavits offered in support of summary judgment have sworn or certified copies of materials referred to in the affidavit attached thereto, the Second Circuit has held that Rule 56(e) defects are waived where the objecting party fails to make a motion to strike. See DeCintio v. Westchester County Med. Ctr., 821 F.2d 111, 113–114 (2d Cir. 1987).

■ The Court concludes that the Town has proffered compelling proof in support of its claim that Columbia deposited hazardous substances at the landfill. As the evidence offered by GACCC in opposition to the Town's proof constitutes mere conjecture at best, the Court concludes that the Town has adequately demonstrated that Columbia was responsible for a "release or threatened release" of hazardous substances. See Matsushita Elec. Indus. Co., 475 U.S. at 586–587, 106 S.Ct. at 1355–1356.

### 2. Are GACCC and G.A. Corrugated, as "dead and buried corporations, subject" to suit under CERCLA?

■ As with Occidental, Marmon and Grumman, the Court is therefore satisfied that the Town has made an adequate prima facie showing that Columbia is a responsible party under CERCLA. It is uncontested that Columbia was merged into GACCC and that GACCC was a wholly-owned subsidiary of G.A. Corrugated. "In general, when two corporations merge pursuant to statutory provisions, liabilities become the responsibili-

ty of the surviving company." *Smith Land & Improvement Corp. v. Celotex Corp.*, 851 F.2d 86, 91 (3d Cir.1988). The Great American defendants maintain that GACCC and G.A. Corrugated, which dissolved in the early 1980s and distributed all of their assets, are "dead and buried" corporations that are no longer subject to suit under CERCLA, despite the fact that the Town's claims against the Great American defendants stem from hazardous waste disposal practices that continued until 1975, well before these corporations were formally dissolved.

The term "dead and buried" corporation refers to those corporations that have been formally dissolved and have distributed all of their corporate assets to their shareholders. *See, e.g., Idylwoods Assocs. v. Mader Capital, Inc.*, 915 F.Supp. 1290, 1304 (W.D.N.Y. 1996). A substantial body of precedent has developed regarding the CERCLA liability of "dead and buried" corporations. As a starting point, the Court must determine the applicability of Rule 17(b) of the Federal Rules of Civil Procedure. Rule 17(b), which addresses capacity to sue and be sued, provides, in pertinent part, that "[t]he capacity of a corporation to sue or be sued shall be determined by the law under which it was organized." The question that is initially presented, therefore, is whether Rule 17(b) applies to CERCLA cases, and consequently requires the Court to look to New York and Delaware law to determine whether GACCC and G.A. Corrugated are subject to suit under CERCLA.

Among those courts that have considered the applicability of Rule 17(b) in the CERCLA arena, a split has emerged between the Seventh and Ninth Circuit Courts of Appeal on one hand, and numerous district courts from the remaining circuits on the other. In *Citizens Elec. Corp. v. Bituminous Fire & Marine Ins. Co.*, 68 F.3d 1016 (7th Cir.1995), the Seventh Circuit determined that Rule 17(b) applied to CERCLA cases and that state law therefore governed the question of whether a corporation should be subject to suit. The court held that 42 U.S.C. § 9607(a), which provides that CERCLA applies "notwithstanding any other provision or rule of law," refers only to substantive liabili-

ty and not to procedural rules, and determined that the corporate capacity issue under Rule 17(b) was indeed a procedural rule. *See also Louisiana–Pacific Corp. v. ASARCO, Inc.*, 5 F.3d 431 (9th Cir.1993); *Levin Metals Corp. v. Parr–Richmond Terminal Co.*, 817 F.2d 1448 (9th Cir.1987). By contrast, those district courts that have found Rule 17(b) to be preempted reason that CERCLA's broad mandate requires the preemption of state corporate capacity laws so that CERCLA liability will not vary from state to state. *See, e.g., Idylwoods Assocs., supra; AM Properties Corp. v. GTE Prods. Corp.*, 844 F.Supp. 1007 (D.N.J.1994); *BASF Corp. v. Central Transport, Inc.*, 830 F.Supp. 1011 (E.D.Mich.1993); *City and County of Denver v. Adolph Coors Co.*, 813 F.Supp. 1471 (D.Colo.1992); *Traverse Bay Area Intermediate Sch. Dist. v. Hitco, Inc.*, 762 F.Supp. 1298 (W.D.Mich.1991); *United States v. Distler*, 741 F.Supp. 643 (W.D.Ky. 1990); *United States v. Sharon Steel Corp.*, 681 F.Supp. 1492 (D.Utah 1987). Still another approach was implicitly raised by the district court in *United States v. SCA Servs. of Indiana, Inc.*, 837 F.Supp. 946 (N.D.Ind. 1993). In that case, the court declined even to consider whether CERCLA preempted Rule 17(b) based on its conclusion that the Indiana corporate capacity laws were not more restrictive than CERCLA, thus suggesting that preemption may be appropriate only when a state corporate capacity statute is more restrictive than CERCLA. *Id.* at 952.

■ The Court concludes that the cases finding Rule 17(b) to be superseded in the CERCLA context are more soundly reasoned, and elects to follow them, regardless of whether state law is more or less restrictive than CERCLA. With all due respect to the opinions of the Seventh and Ninth Circuits, their conclusion that corporate capacity should be determined on a state-by-state basis undermines the logic that exposure to CERCLA liability should be uniform throughout the country and not dependent upon variations of the states' corporate capacity laws. Accordingly, the Court determines that it need not resort to New York and Delaware corporate law to determine

whether GACCC and G.A. Corrugated are liable under CERCLA.

Having determined that CERCLA preempts Rule 17(b) and hence controls the inquiry into the potential liability of GACCC and G.A. Corrugated as dead and buried corporations, the Court now evaluates the analytical framework adopted by federal courts to evaluate CERCLA claims against dead and buried corporations. Not surprisingly, there is no single uniform approach. See Joel R. Burcat and Craig P. Wilson, *Post–Dissolution Liability of Corporations and Their Shareholders Under CERCLA*, 50 Bus. Law., Aug. 1995, at 1273, 1285–1291. Essentially, the courts have confined their focus and disagreements to the central issue of whether a dead and buried corporation may be considered a "person" under CERCLA. CERCLA defines person as "an individual, firm, *corporation*, association, partnership, consortium, joint venture, commercial entity, United States government, State, municipality, commission, political subdivision of a State, or any interstate body." 42 U.S.C. § 9601(21) (emphasis added). This definition is not qualified in any way, unlike other remedial statutes. See *Allied Corp. v. Acme Solvents Reclaiming, Inc.*, 1990 WL 322940 at *3 n. 4 (N.D.Ill. July 6, 1990) (comparing CERCLA with Sherman Anti–Trust Act, 15 U.S.C. § 7, which defines "person" as including "corporations and associations existing under or authorized by the laws of . . . any State.").

One line of cases holds that a corporation's dead and buried status is irrelevant to a determination as to whether it can be subject to suit under CERCLA. In *SCA Servs. of Indiana, Inc., supra*, for example, the defendant SCA Services of Indiana commenced a third-party action against Levin & Sons, Inc. ("Levin"), an Indiana corporation, in 1992. Levin had disposed of all of its corporate assets in 1987 and had been administratively dissolved by the Indiana Secretary of State in 1990. Levin's alleged CERCLA liability arose out of its operation of a facility between 1966 and 1973, during which time hazardous wastes were disposed of at the facility. Levin sought to be dismissed from the third-party action on the ground that it had become a dead and buried corporation prior to suit. In denying Levin's motion, the district court, although concluding that Levin had not properly dissolved under Indiana law, noted that, in any event, "CERCLA allows suits against corporations [as 'persons'] without limitation as to whether the corporation is dissolved or its assets have been distributed." Quoting at length from the decision of Utah district court in *United States v. Sharon Steel Corp.*, 681 F.Supp. 1492, 1498 (D.Utah 1987), the Court determined that the fact that a corporate defendant may as a practical matter be judgment proof does not affect its capacity to be sued under CERCLA. See also *State of North Carolina v. W.R. Peele, Sr. Trust*, 876 F.Supp. 733, 739 (E.D.N.C.1995); *Allied Corp. v. Acme Solvents Reclaiming, Inc., supra.*

By contrast, the district court in *Traverse Bay Area Intermediate Sch. Dist., supra,* while noting that a determination as to the scope of CERCLA liability "must not turn on the collectibility of judgments," *id* at 1301, nonetheless determined that a dead and buried corporation is not a person under CERCLA because any judgment entered against such a corporation would be uncollectible. *Id.* at 1301–1302; *see also AM Properties*, 844 F.Supp. at 1013 ("While the Court recognizes that the determination of the scope of CERCLA liability must not turn on the collectibility of judgments, to allow a suit under CERCLA against a dissolved corporation that has completely wound down and distributed its assets would present various litigation difficulties and judgment collection problems. . . ."); *City and County of Denver*, 813 F.Supp. at 1475 ("[A] court would be foolish to allow a suit against a dissolved corporation that has distributed its assets to the far corners of the country. . . . Fully dissolved corporations would also present inherent difficulties in the parties' ability to gather evidence and a dissolved defendant corporation's ability to present an adequate defense.").

Notably, none of the courts addressing the CERCLA liability of dead and buried corporations have properly prescinded be-

tween or analyzed the difference between corporate persons that are dead and buried at the time a CERCLA action is triggered and those that are dead and buried at the time of suit. *See, e.g., City and County of Denver,* 813 F.Supp. at 1475 (correlating CERCLA definition of "person" to the holding of assets at the time of suit); *Traverse Bay Area Intermediate Sch. Dist.,* 762 F.Supp. at 1301–1302 (same). Section 9607(a)(3) of the Act plainly subjects "any person ... who arranged for disposal or treatment ... of hazardous substances" to liability. There is no indication in CERCLA that liability under this section depends upon whether the defendant corporation is a person at the time of suit. Rather, because liability is triggered by the disposal of hazardous waste, the only logical conclusion is that CERCLA "personhood" is also measured as of the time of this triggering event. This reading of the statute is consistent with the Court's recognition that a CERCLA claim invariably requires extensive investigation, testing and studies, and therefore may be brought at an indeterminate point in time, many years after the disposal of hazardous substances.

This interpretation promotes two policy concerns. First, a holding that personhood is measured at the time of suit and that consequently only extant, solvent corporations are persons under CERCLA would necessarily shrink the range of potentially responsible persons, which would run counter to the breadth of CERCLA's scheme for imposing liability. Second, the Court's holding that personhood for CERCLA purposes is measured at the time that the CERCLA person arranges for disposal of hazardous materials under § 9607(a)(3) promotes the interests in the uniformity of CERCLA enforcement that motivated the Court to conclude that Rule 17(b) must be preempted in the CERCLA context.

Accordingly, the Court concludes that a corporation subject to CERCLA claims based upon hazardous waste disposal that occurred *before* the corporation was dissolved and became dead and buried is not absolved from suit under CERCLA. This conclusion is not only supported by CERCLA's statuto-ry reach but also by common law notions affecting litigation against dead and buried corporations. Helpful to the Court in that respect are those federal cases that have refused to view corporate dissolution and distribution of assets as the linchpin of the inquiry into whether a corporation may be held liable under CERCLA, *see W.R.. Peele, Sr. Trust,* 876 F.Supp. at 739; *SCA Servs. of Indiana,* 837 F.Supp. at 953; *Allied Corp.,* 1990 WL 322940 at *4, and New York authority predicated upon its common law notions as to the circumstances under which a dead and buried corporation can be subject to suit. It is well settled that federal common law, which is implicated under CERCLA because of the need for uniform federal rules of decision in assessing CERCLA liability, *see, e.g., AM Properties.,* 844 F.Supp. at 1012, may incorporate principles of state law as the rule of decision, provided that the state law is consistent with the policies underlying the particular federal interest. *See United States v. Kimbell Foods, Inc.,* 440 U.S. 715, 727–739, 99 S.Ct. 1448, 1457–1464, 59 L.Ed.2d 711 (1979); *United States v. One 1973 Rolls Royce, VIN SRH–16266,* 43 F.3d 794, 806 n. 8 (3d Cir.1994); *Lugo v. AIG Life Ins. Co.,* 852 F.Supp. 187, 193 (S.D.N.Y.1994).

New York's Business Corporation Law § 1006(b) provides, in pertinent part, that "[t]he dissolution of a corporation shall not affect any remedy available to or against such corporation, its directors, officers or shareholders for any right or claim existing or any liability incurred before such dissolution." This statute is consistent with New York decisional law abrogating the English common law rule that the liabilities of a corporation are extinguished by its dissolution. *See Shayne v. Evening Post Pub. Co.,* 168 N.Y. 70, 77, 61 N.E. 115, 155–116 (1901). In rejecting the traditional English rule, the New York Court of Appeals observed that it would be "unjust and arbitrary" to cut off all causes of action against a corporation upon its dissolution, and noted that such a rule would encourage corporate officers to extinguish meritorious causes of action by dissolving a corporation, only to reorganize the corporation later with impunity. *Shayne,* 168 N.Y. at 74, 61 N.E. at 115–116.

Moreover, in regard to dead and buried corporations, New York courts have embraced the principle that a corporation's capacity to be sued does not depend upon whether or not it has distributed its assets. The New York Court of Appeals has indicated that the determinative factor is whether the claim against the corporation existed at the time that it was dissolved; "[w]hether the distribution of its assets in advance of dissolution may make a judgment, if recovered, futile, we do not now consider ... The collection of the judgment must wait upon its entry." *City of New York v. New York & S. Brooklyn Ferry & Steam Transp. Co.,* 231 N.Y. 18, 131 N.E. 554 (1921) (Cardozo, J.); *see also Hudson River Fishermen's Assn. v. Arcuri,* 862 F.Supp. 73, 77 (S.D.N.Y.1994); *Independent Investor Protective League v. Time, Inc.,* 50 N.Y.2d 259, 262–263, 406 N.E.2d 486, 488, 428 N.Y.S.2d 671, 673 (1980); *Fernandez v. Kinsey,* 205 A.D.2d 448, 613 N.Y.S.2d 894, 895 (1st Dep't 1994); *Dominguez v. Fixrammer Corp.,* 172 Misc.2d 868, 656 N.Y.S.2d 111, 113 (Sup.Ct. Bronx Co.1997).

■ The Court agrees with then-Judge Cardozo's observation in *New York & S. Brooklyn Ferry & Steam Transp. Co.* that liability and collectibility are two separate and distinct concepts. A corporation should not be permitted to insulate itself from exposure to CERCLA liability by dissolving and distributing its assets after the disposal of hazardous substances. As (1) Columbia deposited hazardous waste in the landfill, and (2) GACCC and G.A. Corrugated succeeded to Columbia's liabilities prior to their dissolution, the Court concludes that they are persons under CERCLA, regardless of whether or not they were dead and buried at the time the Town brought suit and that they are consequently proper CERCLA defendants.[8]

The bringing of a suit against a corporation that became dead and buried after being exposed to potential CERCLA liability may or may not prove to be pointless in the collection process, which will be governed by state law. For example, under New York law, if a corporation is dissolved fraudulently and its assets subsequently distributed to its shareholders, the shareholders hold the assets they receive in trust for the benefit of the corporation's creditors and remain jointly and severally liable to existing creditors of the corporation to the extent of the corporate property they received. *See Trustees of the Tapers' Ins. Annuity and Pension Funds v. Albee Drywall Partitions Corp.,* 1996 WL 294306 at *6 (S.D.N.Y. June 3, 1996); *Allen Morris Commercial Real Estate Servs. Co. v. Numistatic Collectors Guild, Inc.,* 1993 WL 183771 at *9 (S.D.N.Y. May 27, 1993); *see also United States v. Oscar Frommel & Brothers,* 50 F.2d 73, 74 (2d Cir.1931); *Flute, Inc. v. Rubel,* 682 F.Supp. 184, 187 (S.D.N.Y. 1988); *Rodgers v. Logan,* 121 A.D.2d 250, 253, 503 N.Y.S.2d 36, 39 (1st Dep't 1986).

### 3. Can GAI be held liable for Columbia's waste disposal practices under a veil-piercing analysis?

■ The inquiry into GAI's potential liability under CERCLA stands on a different footing than that undertaken for GACCC and G.A. Corrugated, and requires the Court to consider whether GAI's corporate veil should be pierced.[9] This inquiry is appropriately made under federal common law. *See United States v. Nicolet, Inc.,* 712 F.Supp. 1193, 1201–1203 (E.D.Pa.1989) ("[W]e conclude that the strong federal interest in uniform enforcement of environmental legislation set forth by Congress [and] the very real risk that the application of state laws would frus-

**8.** The issue of whether these corporations can be held liable under the state law claims will be addressed *infra*.

**9.** Although the Great American defendants argue that GAI cannot be held liable for Columbia's waste disposal practices as an "operator" because it did not exercise control over its waste disposal practices, *see Schiavone v. Pearce,* 79 F.3d 248, 254 (2d Cir.1996), this argument is inapposite because it is clear from the Town's submissions that it seeks recovery against GAI

not as the "operator" of a facility but as an "owner" of G.A. Corrugated and GACCC. *See id.* ("A finding of owner liability invokes the parent-subsidiary relationship and can be made only in circumstances that permit corporate veil piercing.... [S]uch owner liability is entirely distinct from parent operator liability, proof of which looks to the independent actions of the parent corporation, evidenced though its control over the polluting site." (citations omitted)).

trate the objectives of the federal program ... warrants the development of a uniform federal rule applicable to alter ego claims under CERCLA."); *see also Idylwoods Assocs.*, 915 F.Supp. at 1305 ("Whether or not a corporation is liable under corporate veil-piercing standards should be analyzed under federal common law, since '[i]t is well established that when a federal statute is silent as to the choice of law to be applied, but overriding federal interests exist, courts should fashion uniform federal rules of decision.'") (quoting *City of New York v. Exxon Corp.*, 112 B.R. 540, 552–553 (S.D.N.Y.1990), *aff'd in part*, 932 F.2d 1020 (2d Cir.1991)). In determining whether to pierce the corporate veil under CERCLA, courts have considered the following factors, in approximately descending order of importance:

> (1) inadequate capitalization in light of the purposes for which the corporation was organized[;] (2) extensive or pervasive control by the shareholder or shareholders[;] (3) intermingling of the corporation's properties or accounts with those of its owner[;] (4) failure to observe corporate formalities and separateness[;] (5) siphoning of funds from the corporation[;] (6) absence of corporate records[;] and (7) nonfunctioning officers or directors.

*In re Acushnet River and New Bedford Harbor Proceedings*, 675 F.Supp. 22, 33 (D.Mass. 1987); *see also Idylwoods Assocs.*, 915 F.Supp. at 1305; *Exxon Corp.*, 112 B.R. at 553; *United States v. Kayser–Roth Corp.*, 724 F.Supp. 15, 20 (D.R.I.1989), *aff'd.* 910 F.2d 24 (1st Cir.1990). "No one of these factors is either necessary or sufficient to disregard corporate separateness. The equitable decision to pierce the veil is dependent on the facts peculiar to each case." *In re Acushnet River & New Bedford Harbor Proceedings*, 675 F.Supp. at 33.

In opposition to the Great American defendants' motion, the Town offers an expert affidavit to the effect that GAI exercised pervasive and dominant control over GACCC because, *inter alia:* (1) GACCC's Board of Directors consisted solely of GAI's Chairman/President, GAI's Secretary, and GAI's Vice–President and, moreover, several corporate officers of GAI were also corporate officers of GACCC; (2) GAI established a $500,000 line of credit for GACCC's capital expenditures; (3) GAI provided management services to GACCC for a fee, but there was apparently no corporate documentation regarding the establishment of the arrangement, the scope of the proposed services and the cost of such services; (4) GAI and GACCC guaranteed certain of each other's financial obligations, which guaranties were not supported by consideration; (5) GAI essentially overlooked the existence of the intermediate subsidiary G.A. Corrugated and dealt with GACCC directly, making decisions that would ordinarily have been made by G.A. Corrugated, the parent corporation, and not by a grandparent; (6) GACCC was seriously undercapitalized and GAI advanced significant sums to GACCC for working capital without approval from their respective Boards of Directors, and apparently without documentation setting forth the interest rates, terms and collateral for these advances; and (7) in connection with the sale of GACCC to LPCCC, LPCCC executed a $3.2 million promissory note to GAI and not to GACCC, the nominal seller, as would be expected in an ordinary sale of assets.

■ While not specifically contesting the expert's observations regarding the corporate structure of GACCC and its interaction with its grandparent GAI, GAI seeks to be relieved from CERCLA liability because there has been no showing, nor could there be, that it exercised any control over the waste disposal practices of *Columbia.* As it is undisputed that neither GACCC nor G.A. Corrugated deposited hazardous waste at the landfill, GAI argues that there is no nexus between its purported control of those corporations and the disposal of hazardous waste at the landfill.

The Court disagrees that this purported lack of nexus is determinative and requires that GAI be dismissed from this action. Preliminarily, the Court concludes that GAI and GACCC did not observe corporate formalities and that, using the seven-part test set forth above as a guide, GACCC was the *alter ego* of GAI. Having reached that conclusion, the Court considers GAI's argument in favor of dismissal completely untenable. As noted

above, when Columbia was merged into GACCC, GACCC assumed Columbia's liabilities. As the Third Circuit observed in *Smith Land & Improvement Corp.*:

> The concerns that have led to a corporations' common law liability ... for the torts of its predecessor are equally applicable to the assessment of responsibility for clean-up costs under CERCLA. The Act views response liability as a remedial, rather than a punitive, measure whose primary aim is to correct the hazardous condition. . . . The costs associated with clean-up must be absorbed somewhere. . . . Congressional intent supports the conclusion that, when choosing between the taxpayers or a successor corporation, the successor should bear the cost. . . . [S]avings resulting from the failure to use *non-hazardous* disposal methods inured to the original corporation, its successors, and their respective stockholders and accrued only indirectly, if at all, to the general public.

*Smith Land & Improvement Corp.*, 851 F.2d at 91–92.

Here, although GACCC may ultimately be held liable for Columbia's dumping practices, GACCC is by all accounts without assets and is therefore judgment-proof. On these facts, it would be completely inappropriate and inequitable to absolve its presumably solvent *alter ego* from liability and pass that liability onto the other defendants. GAI pervasively controlled the financial and administrative dealings of GACCC. Although GAI appears to be taking the position that it should be free from CERCLA liability because its investment in GACCC was not as profitable as it might have hoped, immunizing GAI from liability under such circumstances would encourage corporate parents to disregard the corporate existence of subsidiaries with questionable environmental track records and then engage in paper corporate dissolutions and transfers of corporate assets as a means of evading CERCLA liability. This approach, if endorsed by the Court, would ultimately shift the intrinsic risk of investing in such business ventures to the taxpayers, which is completely contrary to both the history and the spirit of CERCLA.

### 4. Conclusion

The motion of the Great American defendants for summary judgment, to the extent that it seeks dismissal of the CERCLA claims against them, is denied. The Town's motion, to the extent that it seeks summary judgment against GACCC, is granted. Although the Town did not specifically seek summary judgment against GAI, the parties address the CERCLA liability of both GACCC and GAI at great length, and the Town has proceeded against GAI on the theory that it is liable as GACCC's *alter ego*. Accordingly, the Court will construe the Town's motion as being directed to GAI as well as GACCC and hereby grants the Town summary judgment on the issue of CERCLA liability against GAI.

### III. The Successor Liability of the Lin Pac Defendants

The liability of the Lin Pac defendants hinges upon emerging principles of "successor liability" in the CERCLA context. In April 1996, the Town and all of the defendants with the exception of the Great American defendants executed a Statement of Material Undisputed Facts with regard to the Lin Pac defendants' summary judgment motion. The material facts underlying the Lin Pac defendants' purchase of the assets of GACCC are therefore undisputed, leaving the Court with the purely legal question of whether the Lin Pac defendants are liable for Columbia's hazardous waste disposal practices. *See United States v. Mexico Feed and Seed Co.*, 980 F.2d 478, 489 n. 13 (8th Cir. 1992) ("Whether a corporation is a 'substantial continuation' of another is a legal, not a factual, question."). This question is also resolved in accordance with federal common law. *See Betkoski*, 99 F.3d at 519.

A brief review of the details of LPCCC's acquisition of GACCC's assets and operation of its Syosset plant is in order. In March 1980, before CERCLA was enacted, LPCCC purchased all of the physical assets of GACCC, including its plant in Syosset, for approximately $6 million. This purchase did not include GACCC's accounts receivable. LPCCC paid cash for the Syosset plant at the time of closing and executed a promisso-

ry note to cover the balance of the purchase price. There was no transfer, sale, purchase or exchange of stock. The purchase agreement provided that liabilities arising prior to the purchase would remain with the Great American defendants, which agreed to indemnify LPCCC for "all obligations and liabilities of the seller, direct and indirect, fixed or contingent, known and unknown, not expressly assumed by the purchaser."

At the time of the asset purchase, there was no identity of directors between the Lin Pac defendants and the Great American defendants, and LPCCC's directors continued in place after the purchase. There was similarly no identity of shareholders between the Lin Pac defendants and the Great American defendants. Following the purchase, GACCC and G.A. Corrugated continued to exist as corporate entities until their dissolutions in 1982 and 1981, respectively, though GACCC had no significant assets and G.A. Corrugated's assets were limited to its shares in GACCC.

Following the purchase, LPCCC replaced a senior manager employed by GACCC, but retained virtually all of GACCC's employees and managerial staff. LPCCC operated the plant and marketed the corrugated box products manufactured at the plant under its own name to GACCC's existing clients, but also sought to expand its client base. LPCCC operated the plant for seven years, until it was closed in 1987, and during that time effected certain changes in the manufacturing process.

 Based upon these undisputed facts, the Lin Pac defendants maintain that they cannot be held liable for Columbia's waste disposal practices as Columbia's successor because the acquisition of GACCC was a mere asset purchase that should not subject the Lin Pac defendants to GACCC's environmental liabilities. As a general rule, one corporation that acquires the assets of another does not additionally assume the predecessor corporation's liabilities unless one of four criteria are met: (1) the successor corporation either expressly or impliedly agrees to assume the predecessor's liabilities; (2) the transaction is a *defacto* merger; (3) the successor may be considered a mere continua-

tion of the predecessor; or (4) the transaction is fraudulent. *See Betkoski*, 99 F.3d at 519; *United States v. Carolina Transformer Co.*, 978 F.2d 832, 838 (4th Cir.1992); *Gould, Inc. v. A & M Battery and Tire Serv.*, 950 F.Supp. 653, 656 (M.D.Pa.1997).

 As there are no allegations that the transaction was fraudulent and as it is clear from the closing documents that the Lin Pac defendants did not agree to assume GACCC's liabilities, the Court therefore focuses on whether the transaction was a *defacto* merger or whether LPCCC may be considered a mere continuation of GACCC. The Court concludes that the business dealings between the Lin Pac defendants and the Great American defendants did not result in a *defacto* merger. In determining whether a *defacto* merger has taken place, the Court considers: (1) whether there is a continuation of the enterprise of the seller corporation such that there is continuity of management, personnel, location, assets, and general business operations; (2) whether there is a continuity of shareholders; (3) whether the seller has ceased its operations, liquidated and dissolved as soon thereafter as possible; and (4) whether the purchasing corporation assumes those obligations of the seller necessary for the continuation of business operations. *State of New York v. Panex Indus., Inc.*, 1996 WL 378172 at *7–8 (W.D.N.Y. June 24, 1996) (quoting *Philadelphia Elec. Co. v. Hercules, Inc.*, 762 F.2d 303, 310 (3d Cir.1985)); *see also Louisiana–Pacific Corp. v. Asarco, Inc.*, 909 F.2d 1260, 1264–1265 (9th Cir.1990). Here, as noted above, there was no identity of shareholders between the Great American defendants and the Lin Pac defendants either before or after LPCCC's acquisition of GACCC. Courts have not been willing to overlook the identity of shareholders requirement and have consistently refused to find that a *defacto* merger has taken place without such a showing. *See Louisiana–Pacific Corp.*, 909 F.2d at 1264–1265. Accordingly, the Court concludes that there has been no *defacto* merger here, and that the liability of the Lin Pac defendants, if any, must be premised upon a finding that LPCCC was a "mere continuation" of GACCC.

A substantial body of caselaw has arisen construing the scope of the "mere continuation" test. In *Betkoski,* the Second Circuit adopted, as have other courts, the "continuity of enterprise," also known as the "substantial continuity," rule for determining whether this criterion has been satisfied. *Betkoski,* 99 F.3d at 519. This approach looks to the following factors:

> (1) retention of the same employees; (2) retention of the same supervisory personnel; (3) retention of the same production facilities in the same location; (4) production of the same product; (5) retention of the same name; (6) continuity of assets; (7) continuity of general business operations; and (8) whether the successor holds itself out as the continuation of the previous enterprise.

*Carolina Transformer Co.,* 978 F.2d at 838. Here, certain of these factors are unquestionably satisfied. It is undisputed that LPCCC retained most of the managerial personnel and virtually all of the employees of GACCC, at least for some period of time. It purchased all of GACCC's physical assets and continued the same business in the same location. However, apart from a stray reference to GACCC in a filing with the State of New York's Department of Environmental Conservation, LPCCC did not hold itself out as GACCC's successor, nor did it market the containers that it manufactured under GACCC's name.

■ Several other courts have held that two other factors are relevant to a determination of whether successor liability should attach under the substantial continuity test—the purchasing corporation's notice of the seller's potential liabilities and whether the purchasing corporation has "substantial ties" to the selling corporation. *See Mexico Feed & Seed Corp.,* 980 F.2d at 489; *Louisiana–Pacific Corp.,* 909 F.2d at 1265–1266; *Elf Atochem North America v. United States,* 908 F.Supp. 275, 282–283 .(E.D.Pa. 1995); *United States v. Peirce,* 1995 WL 356017 (N.D.N.Y. Feb.21, 1995); *United States v. Atlas Minerals and Chemicals, Inc.,* 824 F.Supp. 46, 51 (E.D.Pa.1993). The Court agrees with the district court in *Peirce* that these factors, while not dispositive,

should be considered along with the other factors set forth in *Carolina Transformer Co.* in determining whether successor liability should attach under the substantial continuity test. *Cf. Atlantic Richfield Co. v. Blosenski,* 847 F.Supp. 1261 (E.D.Pa.1994) (holding that notice not required because CERCLA is a strict liability statute). Although the appropriateness of these two factors was not before the Second Circuit in *Betkoski,* the Second Circuit did cite approvingly to the *Mexico Feed & Seed* decision in its opinion, which is one of the leading cases supporting the consideration of these additional factors in the context of the inquiry into substantial continuity. *See Betkoski,* 99 F.3d at 518.

Applying those two factors to this case, the Lin Pac defendants clearly did not have notice of GACCC's potential liability under CERCLA because CERCLA was not yet enacted at the time LPCCC acquired GACCC's assets. While it is doubtless true that there was public debate regarding the clean-up of hazardous waste facilities in the months leading up to the enactment of CERCLA, the statute and common law setting forth and refining the very notion of successor liability were not in existence at the time of the asset purchase. Regarding the "substantial ties" factor, as in *Mexico Feed & Seed* the asset purchase was an arm's length transaction between competitors, and "not a cozy deal where responsible parties merely changed the form of ownership yet in substance remained the same, nor one where the actual managers of a corporation took over its ownership with full knowledge of its practices." *Mexico Feed & Seed,* 980 F.2d at 489. These additional two factors would thus appear to undermine a finding of substantial continuity.

■ Having considered these two factors, together with all of the other factors that comprise the substantial continuity test, in light of the undisputed facts of this case the Court concludes that the Lin Pac defendants are not proper CERCLA defendants since they cannot be viewed as the mere continuation of their Great American predecessor. The Court is mindful of the broad remedial purpose of CERCLA and the extent to which

courts have expanded traditional principles of tort liability to hold parties responsible for the costs of compliance with CERCLA. *See, e.g., Schiavone v. Pearce,* 79 F.3d at 253–254. However, in this case, such an expansion would be inequitable and would impose an unwarranted penalty upon a good faith third-party purchaser for value. The Lin Pac defendants, with their roots in the United Kingdom, had no ties to the Great American defendants. They purchased the assets of an on-going concern, operated it under the Lin Pac name, sought to expand on the existing client base, and over time made manufacturing and other changes. There is no whiff of impropriety or self-dealing here. In short, to hold the Lin Pac defendants liable on these facts would essentially scrap the common law rule treating asset purchases differently from mergers and consolidations. Accordingly, to the extent that the Lin Pac defendants seek dismissal of the Town's CERCLA claims, their motion for summary judgment is granted.

### IV. Joint and Several Liability vs. Contribution

Having determined that Occidental, Marmon, Grumman, GACCC and GAI are liable under CERCLA, the Court now turns to an examination of the nature of that liability. Each of the defendants contends that the Town may only seek contribution pursuant to § 9613 and cannot impose joint and several liability against them. Implicit in this argument is the assumption, which is not contested by the Town, that the Town is itself a responsible person under CERCLA. Indeed, the record evidence that the Town contributed to the condition of the landfill is compelling. Notwithstanding its status as a responsible person, the Town maintains that it is entitled to seek joint and several liability against the defendants pursuant to 42 U.S.C. § 9607. The parties' dispute regarding the interplay between § 9607 and § 9613 is part of a larger debate amongst the parties as to whether the Town will be required to bear a portion of the response costs attributable to "orphan shares"—those shares attributable to potentially responsible persons that are either insolvent or cannot be located or identified. *See Pinal Creek Group v. Newmont Mining Corp.,* 118 F.3d 1298, 1303 (9th Cir. 1997).

In arguing that it is entitled to seek joint and several liability against all the defendants, the Town relies primarily upon the language of § 9607(a)(4)(B), which, as set forth above, provides for a cause of action in favor of "any ... person" that has incurred response costs consistent with the National Contingency Plan. As noted above, CERCLA's definition of "person" includes municipalities. 42 U.S.C. § 9601(21). In a § 9607 action for recovery of costs, potential responsible persons are ordinarily jointly and severally liable for the costs associated with the clean-up and site remediation. *See New Castle County v. Halliburton NUS Corp.,* 111 F.3d 1116, 1121 (3d Cir.1997). The Town argues that because it is a person that has incurred response costs under CERCLA, it is entitled to joint and several liability against the defendants pursuant to the clear and unequivocal language of § 9607(a)(4)(B), regardless of its status as a responsible person. The Town's argument is premised upon the assumption that a cause of action under § 9607 is procedurally distinct from the right to contribution among potentially responsible persons, which is codified at § 9613(f), and that it may elect to proceed under § 9607 instead of § 9613. This argument has some support among district courts. *See, e.g., Town of Wallkill v. Tesa Tape, Inc.,* 891 F.Supp. 955, 958–960 (S.D.N.Y.1995); *Companies for Fair Allocation v. Axil Corporation,* 853 F.Supp. 575, 577–580 (D.Conn. 1994); *United States v. Kramer,* 757 F.Supp. 397, 416–417 (D.N.J.1991).

All of the circuit courts to have considered this issue have determined, however, that a potentially responsible person, such as the Town, cannot seek joint and several liability against other potentially responsible persons, but may only seek contribution pursuant to § 9613. *See Sun Co. v. Browning–Ferris, Inc.,* 124 F.3d 1187 (10th Cir.1997); *Pinal Creek Group,* 118 F.2d 1298; *New Castle County,* 111 F.3d 1116; *Bancamerica Commercial Corp. v. Mosher Steel of Kansas,* 100 F.3d 792 (10th Cir.), amended by 103 F.3d 80 (1996); *Redwing Carriers, Inc. v. Saraland Apartments,* 94 F.3d 1489 (11th Cir.1996);

*United States v. Colorado & E.R.R. Co.*, 50 F.3d 1530 (10th Cir.1995); *United Technologies Corp. v. Browning–Ferris Indus., Inc.*, 33 F.3d 96 (1st Cir.1994); *Akzo Coatings, Inc. v. Aigner Corp.*, 30 F.3d 761 (7th Cir. 1994). As articulated by certain of these courts, although the right of one potentially responsible person to pursue another for response costs derives from § 9607, the nature of that claim is necessarily one for contribution and is mapped out by § 9613. *See, e.g., Sun Co.*, 124 F.3d 1187, 1190 ("While a [§ 9413] contribution action is not a 'cost recovery' action under [§ 9607] as that action has been defined, because it does not impose strict, joint and several liability on the defendant PRPs, it is an action for recovery of the costs referred to in [§ 9607]."); *Pinal Creek Group*, 118 F.3d at 1298 ("[W]hile [§ 9607] created the right of contribution, the 'machinery' of [§ 9613] governs and regulates such actions, providing the details and explicit recognition that were missing from the text of [§ 9607]."); *New Castle County*, 111 F.3d at 1122 ("[42 U.S.C. § 9613] does not in itself create any new liabilities; rather, it confirms the right of a potentially responsible person under section 107 [42 U.S.C. § 9607] to obtain contribution from other potentially responsible persons.").

The conclusion that § 9607 incorporates a contribution claim is consistent with the history leading up to the enactment of § 9613(f). As originally enacted, CERCLA did not provide specifically that one potentially responsible person could recover from other potentially responsible persons to the extent that its response costs exceeded its fair share; however, courts determined that a right to contribution in such cases could be implied from the language of § *9607. See, e.g., Mardan Corp. v. C.G.C. Music Ltd.*, 804 F.2d 1454, 1457 n. 3 (9th Cir.1986). In 1986, Congress enacted the Superfund Amendments and Reauthorization Act of 1986 ("SARA"), Pub.L. No. 99–499 *et seq.*, 100 Stat. 1613, 1615 (1986), which amended § 9613 to expressly authorize contribution among responsible parties. A principal goal of the amended § 9613 was to " 'clarif[y] and confirm[ ] the right of a person held jointly and severally liable under CERCLA to seek contribution from other potentially liable parties, when the person believes that it has assumed a share of the cleanup or cost that may be greater than its equitable share under the circumstances.' " *United Technologies Corp.*, 33 F.3d at 100 (quoting S. Rep. No. 11, 99th Cong., 1st Sess. 44 (1985)).

■ Having considered the arguments on both sides, the Court agrees with the Courts of Appeal for the First, Third, Seventh, Ninth, Tenth and Eleventh Circuits that the Town, as a responsible person, may proceed against the defendants under § 9607, but that the nature of its claim is for contribution as set forth in § 9613. The Court reaches this conclusion for a number of reasons. First, regardless of how the Town seeks to cast its CERCLA claim, the reality is that because the Town itself is liable to some extent for the condition of the landfill, its claim is quintessentially a claim for contribution. *See Akzo Coatings, Inc.*, 30 F.3d at 764; *see also New Castle County*, 111 F.3d at 1122; *Colorado & E. R.R. Co.*, 50 F.3d at 1536. Second, and more significantly, the Court observes that § 9607 is a generous statutory provision. It has a longer statute of limitations than § 9613 (six years as opposed to three years) and has been interpreted to provide for strict, joint and several liability. If the Court were to hold that § 9607 and § 9613 give potentially responsible persons two entirely separate theories of recovery from which to choose, it is difficult to imagine that any potentially responsible person would ever elect to proceed under § 9613. Such a reading would effectively eviscerate § 9613. See *New Castle County*, 111 F.3d at 1123; *Colorado & E. R.R. Co.*, 50 F.3d at 1536; *United Technologies Corp.*, 33 F.3d at 101. In the final analysis, to read § 9613 as mapping out the parameters of a contribution right that has its genesis in § 9607 reconciles CERCLA's emphasis on placing the burden of environmental remediation upon those parties that created the environmental harm with the legislative history of SARA, which demonstrates Congress' concern that this burden be equitably apportioned. Accordingly, the Court grants the defendants' motion for summary judgment insofar as it seeks dismissal of the Town's first and second claims for joint and several

liability under CERCLA, and denies the Town's motion for summary judgment to the extent that it seeks to impose joint and several liability against the defendants.

## V. The Town's State Law Claims

As noted above, the complaint also contains three state law claims. The fourth claim is for creation and maintenance of a public nuisance, the fifth claim is for unjust enrichment based upon the defendants' alleged failure to abate the public nuisance, and the sixth claim is for common law contribution. Defendants now seek dismissal of the public nuisance and unjust enrichment claims on statute of limitations grounds. Additionally, the Great American defendants seek dismissal of the common law claims for the same reason as they sought dismissal of the CERCLA claims—because GACCC and G.A. Corrugated are dead and buried corporations that are no longer amenable to suit. The Court will examine each of these arguments in turn.

### A. Statute of Limitations

■■■ Turning first to the Town's nuisance claim, the Court notes that under New York law, a public nuisance:

> consists of conduct or omissions which offend, interfere with or cause damage to the public in the exercise of rights common to all in a manner such as to offend public morals, interfere with use by the public of a public place, or endanger or injure the property, health, safety or comfort of a considerable number of persons.

*Copart Industries, Inc. v. Consolidated Edison Co. of New York*, 41 N.Y.2d 564, 568, 362 N.E.2d 968, 971, 394 N.Y.S.2d 169, 172 (1977). "To establish a public nuisance the annoyance, discomfort or interference experienced by a considerable number of persons must be substantial." *State of New York v. Fermenta ASC Corp.*, 166 Misc.2d 524, 531, 630 N.Y.S.2d 884, 890 (Sup.Ct. Suffolk Cty. 1995), *aff'd*, 238 A.D.2d 400, 656 N.Y.S.2d 342 (2d Dep't 1997).

The statute of limitations applicable to the Town's public nuisance claim is controlled by C.P.L.R. 214–c, which provides, in pertinent part:

> [T]he three year period within which an action to recover damages for ... injury to property caused by the latent effects of exposure to any substance or combination of substances, in any form ... upon or within property must be commenced shall be computed from the date of discovery of the injury by the plaintiff or from the date when through the exercise of reasonable diligence such injury should have been discovered by the plaintiff, whichever is earlier.

In *Jensen v. General Elec. Co.*, 82 N.Y.2d 77, 623 N.E.2d 547, 603 N.Y.S.2d 420 (1993), the New York State Court of Appeals held that this section imposed a clear-cut discovery rule in actions for damages.

■■■ As discovery of the harm triggers the running of the statute of limitations under New York law, the Court looks to when the Town can be said to have discovered the harm. The landfill was placed on the National Priorities List in 1983 and the Town signed the Administrative Order on Consent in which it agreed to prepare the RI/FS for the landfill in 1986. Further, it was in 1990 that the EPA selected the remediation that would be required for OU–1. The complaint was filed in 1994. The Town clearly had notice of the alleged damage to the landfill property long before it elected to commence this action. To the extent that the Town seeks to recover sums already incurred for remediation of the landfill, these sums are clearly in the nature of consequential damages and are time-barred.

■■■ The Town argues, however, that it is primarily seeking a declaration imposing liability and ordering the defendants to pay for or carry out future remediation of the landfill, and that C.P.L.R. 214–c applies only to actions for damages. In *Jensen*, the Court of Appeals held this distinction to be a proper one, concluding that the discovery rule contained in this section applies only to actions for damages and that the traditional common law rule applies to the extent that a plaintiff seeks injunctive relief. *Id.* at 90–91, 587 N.Y.S.2d 568, 600 N.E.2d 199. Under common law, a continuing injury to real property gives rise to successive causes of

action for the duration of the injury, and the right of the property owner to invoke the equitable power of the court similarly continues, regardless of the lapse of time that might occur before the commencement of legal proceedings. *See Galway v. Metropolitan Elevated Ry. Co.,* 128 N.Y. 132, 144–145, 28 N.E. 479, 481 (1891)*; see also Jensen,* 82 N.Y.2d at 90–91, 603 N.Y.S.2d 420, 623 N.E.2d 547; *509 Sixth Avenue Corp. v. New York City Transit Auth.,* 15 N.Y.2d 48, 52, 255 N.Y.S.2d 89, 92, 203 N.E.2d 486, 488 (1964). Accordingly, to the extent that the Town seeks an order directing the defendants to carry out any remediation as may be needed in the future, such relief would not be in the nature of damages and is consequently not barred by C.P.L.R. 214–c.

▮▮▮▮ As for the Town's fifth claim, for unjust enrichment, New York courts have held that the central inquiry on such a claim is whether it would be against "equity and good conscience" for the defendant to retain a benefit that it has allegedly received:

> Such a claim is undoubtedly equitable and depends upon broad considerations of equity and justice. Generally, courts will look to see if a benefit has been conferred on the defendant under mistake of fact or law, if the benefit still remains with the defendant, if there has been otherwise a change of position by the defendant, and whether the defendant's conduct was tortious or fraudulent.

*Paramount Film Distrib. Corp. v. State of New York,* 30 N.Y.2d 415, 421, 285 N.E.2d 695, 698, 334 N.Y.S.2d 388, 393, *modified,* 31 N.Y.2d 678, 288 N.E.2d 811, 336 N.Y.S.2d 911 (1972). A cause of action for unjust enrichment is governed by a six-year statute of limitations that starts to run upon the occurrence of the wrongful act giving rise to the duty of restitution. *See Congregation Yetev Lev D'Satmar, Inc. v. 26 Adar N.B. Corp.,* 192 A.D.2d 501, 503, 596 N.Y.S.2d 435, 437 (2d Dep't 1993). In this case, the EPA and the Town began negotiations regarding remediation of the landfill in 1990 and it was also in 1990 that the EPA wrote to a number of the defendants to determine whether they would contribute to the remediation effort. Later that year, the EPA selected the reme-

dial action for OU–1. Since the defendants' obligation to contribute to the remediation was triggered by the EPA's 1990 letter and its subsequent selection of appropriate remedial action later that year, the Court will measure the six-year statute of limitations from 1990. As this action was commenced in 1994, the Town's fifth claim for relief is timely.

### B. The Liability of GACCC and GAI Corrugated under State Law

▮▮▮▮ Having determined that the fourth (nuisance) and fifth (unjust enrichment) claims are timely, the Court now turns to the argument of the Great American defendants that these claims, along with the sixth claim for common law contribution, should be dismissed as against GACCC, formerly a New York corporation, and G.A. Corrugated, formerly a Delaware corporation, because these corporations are dead and buried. As to GACCC, which was incorporated under New York law, there is no evidence in the record that this corporation was not properly dissolved in accordance with New York's Business Corporation Law § 1004. However, as set forth at length above, the law in New York is that a claim that accrues prior to a corporation's dissolution may be interposed against the dissolved corporation, even if it has distributed its corporate assets. *See Independent Investor Protective League,* 50 N.Y.2d at 262–263, 406 N.E.2d at 487–488, 428 N.Y.S.2d at 672–673; *Fernandez v. Kinsey,* 205 A.D.2d 448, 613 N.Y.S.2d 894 (1994). In this case, the Town's nuisance claim arose out of the disposal of hazardous waste at the landfill that occurred until 1975, seven years before GACCC's corporate dissolution. Therefore, as the Town's nuisance claim accrued before GACCC's dissolution, this claim, to the extent that it seeks equitable relief against GACCC, may proceed. As noted above, however, the Town's nuisance claim, to the extent that it seeks consequential damages related to the disposal of hazardous substances at the landfill, is barred by the three-year statute of limitations. Although it may be an academic exercise to permit a claim for equitable relief to proceed against a dead and buried corporation, such a result appears to be conceptually correct under controlling New York precedent.

As to the unjust enrichment and contribution claims, since they did not accrue until well after GACCC was dissolved, they may not be maintained. *See Quinn v. Spitale,* 203 A.D.2d 674, 675, 610 N.Y.S.2d 370, 371 (3d Dep't 1994) ("A cause of action for contribution arises not on the date of injury for which the party seeking contribution may be held liable, but at the time that payment is made on the underlying claim."); *Congregation Yetev Lev D'Satmar,* 192 A.D.2d at 503, 596 N.Y.S.2d 435 (holding that cause of action for unjust enrichment accrues upon payment of sum giving rise to duty of restitution).

 As to G.A. Corrugated, which was dissolved under Delaware law, the controlling statute is title 8, § 278 of the Delaware Code, which provides that "[a]ll corporations, whether they expire by their own limitation or are otherwise dissolved, shall nevertheless be continued, for the term of 3 years from such expiration or dissolution ... for the purpose of prosecuting and defending suits, whether civil, criminal or administrative, by or against them." Although not technically a statute of limitations, this section has been held to be "a clear expression of a legislative policy normally prohibiting the commencement of actions by or against dissolved corporations more than three years after their dissolution." *Smith–Johnson Steamship Corp. v. United States,* 231 F.Supp. 184, 186 (D.Del.1964). Courts have consistently concluded that upon expiration of the three-year period, the corporation ceases to exist as a legal entity and no claims may be asserted against it. *See In re RegO Co.,* 623 A.2d 92, 96 (Del.Ch.1992); *In re Citadel Indus., Inc.* 423 A.2d 500, 506–507 (Del.Ch.1980); *see also State of New York v. Panex Indus., Inc.,* 1997 WL 627635 at *3 (W.D.N.Y. Oct.6, 1997); *Corcoran* v. New *York Power Auth.,* 935 F.Supp. 376, 391–392 (S.D.N.Y.1996). As the complaint in this case was filed in 1994, almost thirteen years after G.A. Corrugated was dissolved, the Town's assertion of state law claims against G.A. Corrugated is prohibited by Delaware law.

### C. The Liability of the Lin Pac Defendants under State Law

For the reasons set forth in respect to the Lin Pac defendants' motion for summary

judgment dismissing the CERCLA claims, their motion for dismissal of the state law claims is also granted, as the factors discussed with regard to the CERCLA claims also apply to the Town's state law claims. *See Schumacher v. Richards Shear Co.,* 59 N.Y.2d 239, 451 N.E.2d 195, 464 N.Y.S.2d 437 (1983); *see also Heights v. US. Elec. Tool Co.,* 138 A.D.2d 369, 370, 525 N.Y.S.2d 653 (2d Dep't 1988).

### CONCLUSION

Based upon the foregoing, the four pending motions are resolved as follows:

1. The Town's motion for summary judgment is granted to the extent that summary judgment is awarded on the Town's third claim for relief against Occidental, Marmon, Grumman, GACCC and GAI on the issue of CERCLA liability only, but is denied to the extent that the Town seeks a determination that the defendants are jointly and severally liable pursuant to its first and second claims for relief;

2. Defendants' motion for summary judgment is decided as follows: (1) the Town's first and second claims for relief, which seek the imposition of joint and several liability against the defendants, are dismissed; (2) the Town's fourth claim for relief, insofar as it seeks damages related to the Town's remediation of the landfill, is dismissed as time-barred; and (3) the motion is otherwise denied;

3. The Great American defendants' motion for summary judgment is granted to the extent that the fourth, fifth and sixth claims for relief are dismissed as against G.A. Corrugated, and the fifth and sixth claims for relief are dismissed as against GACCC, and is otherwise denied;

4. The Lin Pac defendants' motion for summary judgment is granted and the complaint dismissed against these defendants.

**SO ORDERED.**